[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14469
_____

D.C. Docket No. 1:10-cr-00160-ODE-GGB-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARK JOSHUA RUARK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 27, 2015)

Before HULL, ANDERSON, and FARRIS,[*] Circuit Judges.

PER CURIAM:

Defendant Mark Ruark appeals from the district court's order granting the government permission to medicate him involuntarily for the purpose of rendering him competent to stand trial.[1]  To prevail, Ruark must show that the district court clearly erred in finding that the government satisfied its burden under Sell v. United States, 539 U.S. 166, 123 S. Ct. 2174 (2003).

In Sell, the Supreme Court laid out four factors the government must satisfy for involuntary medication to render a defendant competent to stand trial: (1) important government interests must be at stake; (2) involuntary medication must significantly further the state interests in assuring a fair and timely trial; (3) involuntary medication must be necessary to further the state interests; and (4) administration of the medication must be medically appropriate, meaning in the patient's best medical interest in light of his medical condition.  Id. at 180–81, 123

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]The order on appeal is not a final order. See 28 U.S.C. §§ 1291, 1292.  Nevertheless, we have jurisdiction over the present appeal under the collateral-order doctrine, as it: (1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment.  United States v. Diaz, 630 F.3d 1314, 1330 n. 12 (11th Cir. 2011) (affirming district court order granting government motion for involuntary medication for purposes of rendering defendant facing armed robbery and firearms charges competent to stand trial).

S. Ct. at 2184–85.[2]  This Court reviews the first Sell factor de novo, and we review the remaining three Sell factors for clear error.  United States v. Diaz, 630 F.3d 1314, 1330-31 (11th Cir. 2011).  After review of the parties' briefs and the record, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND

### A.  Indictment and Initial Competency Determination

On April 13, 2010, Defendant Ruark was charged with bank robbery, Hobbs Act robbery, two counts of carrying a firearm during a crime of violence, and possession of a firearm by a convicted felon.[3]  Immediately following his indictment, Ruark was brought into federal custody on a writ, and the magistrate judge assigned to his case ordered his detention.  Ruark has been in custody since April 2010.

---

[2]The government bears the burden of proving the factual findings underlying the Sell factors by clear and convincing evidence.  Diaz, 630 F.3d at 1332.

[3]On April 13, 2010, a federal grand jury returned a five-count indictment against Ruark. Count One alleges that in December of 2009 Ruark carried out an armed robbery of a bank in Kennesaw, Georgia, in violation of 18 U.S.C. § 2113(a) and (d).  Count Two charges Ruark with carrying and brandishing a firearm during and in relation to that bank robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  Count Three states that, also in December of 2009, Ruark robbed the Cost Plus World Market in Kennesaw, a business engaged in interstate commerce, in violation of 18 U.S.C. § 1951.  Count Four alleges that Ruark brandished and carried a firearm during that Cost Plus robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  Finally, Count Five charges Ruark with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

3

In May 2011, Ruark's trial counsel moved for an order declaring Ruark incompetent to stand trial. On February 13, 2012, following a psychiatric evaluation and a competency hearing, both sides agreed that Ruark was not fit to stand trial, and the magistrate judge entered an order committing Ruark to the custody of the Attorney General for psychiatric treatment. Ruark was transferred to the Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield"). On September 13, 2012, the magistrate judge granted the government "an additional reasonable period of time" to continue Ruark's mental health treatment to determine if there was a substantial probability Ruark could be rendered competent to stand trial. That additional period of mental health treatment at Springfield was to end December 18, 2012.

## B.    First Treatment at Springfield

On January 15, 2013, the medical staff at Springfield issued a psychiatric report on Ruark's status and treatment. The report shows that Ruark meets the diagnostic criteria for paranoid schizophrenia. It further stated that Ruark was "substantially unlikely to be restored to competency in the foreseeable future in the absence of anti-psychotic medication."

On February 25, 2013, the government moved for involuntary medication of Ruark for the purpose of restoring his competency to stand trial. The government requested (1) a hearing as outlined in Sell v. United States and (2) that Ruark be

4

medicated involuntarily in attempt to render him competent.  Ruark opposed the motion.

## C.    The Sell Hearing

The Sell hearing before the magistrate judge was held in two stages.  On May 20, 2013, the government presented testimony from Dr. Lea Ann Preston-Baecht, a staff psychologist at Springfield, and Dr. Robert Sarrazin, the chief of psychiatry at Springfield.  On November 5 and 6, 2013, Ruark's counsel was given the opportunity to cross-examine both Dr. Preston-Baecht and Dr. Sarrazin in person.  At that hearing, defense counsel also presented testimony from Dr. Gabriella Ramirez-Laon, a clinical psychologist at the United States Penitentiary in Atlanta ("USP Atlanta").  Because the evidence made available to the court at the Sell hearing underlies this appeal, we review in detail the testimony of the witnesses.

Dr. Preston-Baecht has worked as a staff psychologist at Springfield since 2000.  In this time, she has evaluated hundreds of inmates and has testified as an expert in forensic psychology in numerous federal court proceedings, including 30 to 40 hearings regarding the involuntary medication of a defendant.  Dr. Preston-Baecht testified that an earlier review (in 2007) of her cases revealed that 80 percent of the defendants who were involuntarily medicated were successfully restored to competency.  She also testified that success rate since that time was

relatively similar, with 75 to 80 percent of involuntarily medicated defendants being restored to competency.

Dr. Preston-Baecht conducted an evaluation of Ruark when he first arrived at Springfield.  Based on Ruark's medical records and the personal evaluation, Dr. Preston-Baecht diagnosed Ruark as suffering from paranoid schizophrenia.  Dr. Preston-Baecht saw Ruark on a regular basis during his time at Springfield.  For a short period of time, Dr. Preston-Baecht was able to convince him to resume taking Geodon, an antipsychotic which he took briefly under the care of doctors at USP Atlanta.  After two months, Ruark abruptly stopped taking the Geodon because he believed that it weakened his immune system, causing him to catch a cold.  Dr. Preston-Baecht did not believe that Ruark was on the Geodon for long enough, or in a high enough dose, for it to be fully effective.  Ruark briefly resumed the Geodon in August of 2012, but stopped again after a short time and refused to take it for the remainder of his stay at Springfield.

Because of Ruark's refusal to take antipsychotic medication, Dr. Preston-Baecht requested an administrative hearing on whether Ruark could be involuntarily medicated on grounds of disability or dangerousness.  Bureau of Prisons ("BOP") regulations allow for an administrative order of involuntary medication in cases where the inmate's condition poses a danger to himself or to others.  The hearing officer concluded that Ruark did suffer from a psychotic

disorder but did not pose a danger to others while he remained in a correctional environment. Therefore, that request for involuntary medication was denied.

At the subsequent Sell hearing in November 2013, Dr. Preston-Baecht also testified that alternative forms of treatment such as counseling likely would not be successful in reducing Ruark's paranoia. The Springfield facility has a competency restoration group that prisoners are encouraged to attend on a weekly basis. Ruark attended two sessions of the group and subsequently refused to attend.

Dr. Preston-Baecht opined that Ruark was unlikely to regain competency without medication. His symptoms affected his ability to meaningfully participate in his defense. Dr. Preston-Baecht stated that Ruark did not show a rational appreciation of the charges against him and "expressed great distress towards a number of individuals in the courtroom," including defense counsel. Without further treatment, Dr. Preston-Baecht did not believe that Ruark would be able to testify relevantly, communicate with his defense counsel, or make well-reasoned decisions regarding his case.

Testifying about the necessary length of treatment, Dr. Preston-Baecht testified that patients with schizophrenia generally must take medication for four to eight months before successfully regaining competency. She testified both that

7

antipsychotic medication would be medically appropriate in Ruark's case and that there are no less intrusive methods available.

Dr. Robert Sarrazin testified that he has served as chief of psychiatry at Springfield since 2004. He has performed psychiatric evaluations in hundreds of cases and has frequently testified in cases where involuntary medication is sought by the government. In cases where involuntary medication was ordered, Dr. Sarrazin testified that between 75 and 80 percent of his patients were ultimately restored to competency. In his written report, Dr. Sarrazin discusses multiple studies regarding the effectiveness of involuntary medication in treating schizophrenic prisoners. Based on these studies and his own experience, Dr. Sarrazin believes that antipsychotic medications are "the gold standard for treatment of individuals with schizophrenia."

Dr. Sarrazin noticed some improvement in Ruark's symptoms during the period Ruark was on Geodon. But Dr. Sarrazin also stated such progress was limited. Ruark remained "hypervigilant" and paranoid in his dealings with others. In Dr. Sarrazin's opinion, had Ruark stayed on the medication, he would have increased the dosage to 80 milligrams during the day and 120 milligrams in the evening. Ruark appeared to be tolerating the Geodon "without difficulty," and Dr. Sarrazin observed no serious side effects. In his testimony and his written report,

8

Dr. Sarrazin also described the potential side effects of antipsychotic medications at some length.[4]

Further, Dr. Sarrazin testified that Ruark is not likely to regain competency in the absence of medication.  According to Dr. Sarrazin, a patient on antipsychotics generally will begin to show signs of improvement within six to eight weeks, with full restoration to competency in four to eight months.  Although there is no cure for schizophrenia, the rationale for antipsychotic medications is that they will likely reduce Ruark's level of paranoia and make him less focused on his delusions, allowing him to work with his attorney on his defense strategy.

***

[4]These drugs are classified as "first generation" or "second generation."  Examples of first-generation drugs include Haloperidol (also known as Haldol) and Fluphenazine Prolixin.  Second-generation antipsychotics include Geodon, Abilify, Risperdal, and Zyprexa.  First-generation antipsychotics sometimes cause shakiness, stiffness, akathisia (internal restlessness), and tardive dyskinesia, which is characterized by abnormal body movements.  Those symptoms are not seen as frequently with second-generation drugs.  On the other hand, second-generation drugs can cause elevated glucose levels, weight gain, and elevated lipids.  These metabolic symptoms are often seen with Seroquel and Zyprexa but are less common with Abilify and Geodon.

The staff at Springfield is trained to recognize and treat all of these side effects.  Most symptoms can be treated by adjusting the dosage of the antipsychotic medication or by administering ancillary medications.  Patients are monitored to ensure that they are not displaying elevated levels of glucose, lipids, and cholesterol.  Those problems can be treated by changing medication dosages, altering diet, or encouraging patients to get more exercise.  If a patient suffers from serious side effects, the patient will be switched to a different antipsychotic medication.

Other side effects are rarer but more serious.  Neuroleptic malignant syndrome is a condition that triggers high body temperature, muscle breakdown, and kidney problems.  It usually occurs when a patient is given an initial dose of a first-generation antipsychotic.  Another dangerous side effect is cardiac arrythmia, which can result in sudden death.   The medical staff monitors for this condition by checking an electrocardiogram.  The medical staff has the ability to quickly move the patient to a nearby hospital if an intensive care setting is needed.  Antipsychotics also can trigger drug-induced parkinsonism, which is characterized by tremors similar to those seen in Parkinson's disease.  That condition can be effectively treated through the use of ancillary medications.

Dr. Sarrazin believed that treatment with antipsychotics is appropriate for Ruark on medical grounds.  Antipsychotics are unlikely to cause side effects that will prevent Ruark from communicating with his attorney or receiving a fair trial.

Dr. Sarrazin's written report details the treatment plan that will be implemented should a court order that Ruark be involuntarily medicated.  The staff at Springfield will first present Ruark with a copy of the order and will try to convince him to take an oral antipsychotic medication at the lowest effective dose. If Ruark is willing to cooperate, he will be given Abilify, Geodon, Risperdal, or Haldol.  If he suffers from any side effects that are not relieved by adjunctive medications, he will be switched to another antipsychotic.  If Ruark is unwilling to cooperate and must be forcibly medicated, Dr. Sarrazin will begin by administering a test dose of 5 milligrams of Haldol.  If Ruark develops neuromuscular side effects during his treatment, he will be given other medications to treat those adverse effects.  If Ruark becomes agitated or combative during the involuntary medication process, he will be given an injection of Lorazepam, a sedative.

While Ruark is being involuntarily medicated, he will be "monitored for possible development of diabetes or possible emergence of elevated serum lipids." The medical staff will check his weight and glucose level every month and monitor his serum lipids every three months.

10

Dr. Gabriella Ramirez-Laon also testified.  Dr. Ramirez-Laon works as a psychologist at USP Atlanta.  Dr. Ramirez-Laon testified that Ruark took medication only sporadically since returning to USP Atlanta.

Ruark also spoke for himself during the <u>Sell</u> hearing.  At the conclusion of the first part of the hearing on May 20, he expressed adamant opposition to any involuntary medication and suggested that the Geodon that he previously took had caused serious side effects:

> That is like rape.  I never hurt nobody.  I was thinking differently than they want me to think.  I was taking the medicine when I had problems, I still wasn't thinking the way they wanted me to think.  They wanted me to take more, couldn't walk down the hallway, lay in bed all hours of the day until I work again.  I will not feel better, I will not talk to doctors any more if they do that.  I barely not talk to them.  I trusted Dr. Preston.  She sat there today and lied.

Ruark reiterated his objections during the second part of the hearing.

Ruark, through his counsel, also introduced excerpts from the Physician's Desk Reference ("PDR") regarding treatment guidelines for various antipsychotic drugs.  These guidelines show that Geodon was approved by the Food and Drug Administration ("FDA") for target ranges between 20 milligrams and 100 milligrams twice per day.  In the PDR, dosages of greater than 80 milligrams twice per day are "not generally recommended."  Ruark argued that these excerpts show that the maximum dosages that Dr. Sarrazin requested permission to administer are

11

greater than those approved by the FDA.  Dr. Sarrazin testified, however, that there are instances when psychiatrists may prescribe medications off-label.  Sometimes literature will be published after FDA approval showing that a greater dosage than what is prescribed in the PDR is medically appropriate.

Ruark also presented evidence that he has a history of diabetes in his family. Ruark argued this was relevant because elevated glucose levels are one side effect of antipsychotic medications.  When questioned about Ruark's family history, Dr. Sarrazin noted that some second-generation antipsychotics, such as Abilify and Geodon, do not appear to have any effect on the patient's glucose level and restated that Ruark's glucose levels will be closely monitored.

## D.    The District Court's Order

On February 25, 2014, the magistrate judge issued a report and recommendation ("R&R") concluding that the government met its burden under Sell and that involuntary medication of Ruark should proceed.  Ruark filed objections to the R&R.

In an October 2, 2014 order, the district court overruled Ruark's objections, adopted the R&R in full, and granted the government's motion for involuntary medication.

Ruark timely appealed.  On October 14, 2014, following a motion by Ruark's defense counsel and a hearing, the district court stayed its authorization of

12

involuntary medication pending this appeal.  However, the district court denied

defense counsel's motion as to the remainder of its order, which transferred Ruark

back to Springfield for psychiatric treatment (though not involuntarily medication).

Ruark is currently incarcerated at Springfield.

## II.  DISCUSSION

### A.    Sell v. United States and United States v. Diaz

In Sell v. United States, the Supreme Court held that "an individual has a

constitutionally protected liberty interest in avoiding involuntary administration of

antipsychotic drugs—an interest that only an essential or overriding state interest

might overcome."  539 U.S. at 178–79, 123 S. Ct. at 2183 (internal quotation

marks omitted).  As noted above, when the government seeks to have a defendant

involuntarily medicated in order to restore him to competency, a court must

consider four factors: (1) whether the government has an important interest in

proceeding to trial; (2) whether involuntary medication would significantly further

that interest; (3) whether involuntary medication is necessary to further the

government's interest; and (4) whether involuntary medication is medically

appropriate, meaning that it is in the patient's best medical interest in light of his

medical condition.  Id. at 180–81, 123 S. Ct. at 2184-85.[5]

_____

[5]Before even applying the Sell factors, a district court first should consider whether
involuntary medication is appropriate on the ground that the defendant poses a danger to himself
or others.  Sell, 539 U.S. at 183, 123 S. Ct. at 2186 (2003).  Involuntary medication is permitted

In <u>United States v. Diaz</u>, this Court held that a defendant awaiting trial on charges of armed robbery and firearms offenses could be involuntarily medicated to restore him to competency to stand trial. 630 F.3d at 1335.  In <u>Diaz</u>, a defendant suffering from paranoid schizophrenia, incarcerated at Springfield under the care of, among others, Dr. Sarrazin, refused to take antipsychotic medication.  <u>Id.</u> at 1318-25.  The government moved for involuntary medication under <u>Sell</u>, which the district court granted.

This Court held that the district court did not clearly err in ordering involuntary medication of the defendant.  <u>Id.</u> at 1335.  The defendant Diaz argued that the government could not carry its burden on the second and third Sell factors. <u>Id.</u>  Looking to the wealth of evidence available from the <u>Sell</u> hearing about defendant Diaz, we stated: (1) "the district court did not clearly err because the evidence strongly demonstrates a substantial likelihood that anti-psychotic medication will restore Diaz to competency and is not substantially likely to cause side effects that would interfere with Diaz's ability to assist counsel," <u>id.</u> at 1332; and (2) "[g]iven the ample evidence . . . that [defendant] has . . . refused to take medication, and that alternative treatments . . . would be ineffective, the district

---

in those situations under <u>Washington v. Harper</u>, 494 U.S. 210, 110 S. Ct. 1028 (1990).  Here, the BOP has determined that Ruark does not pose a danger so long as he remains in a penal setting.  Thus, involuntary medication under <u>Harper</u> would not be appropriate at this time.

court did not clearly err in concluding that . . . involuntary medication is necessary to render [defendant] competent to stand trial." Id. at 1335-36.

## B.    Applying Sell and Diaz Here

The four-factor test of Sell was met by the government here.  The government introduced sufficient evidence to show that the district court's order of involuntary medication was not clear error.  We review the Sell factors separately.

First, the district court must find that important governmental interests are at stake.  Sell, 539 U.S. at 180, 123 S. Ct. at 2184.  "[B]ringing to trial an individual accused of a serious crime" is an important governmental interest.  Id.  Ruark is accused of, among other crimes, armed robbery of a bank and a retail market.  These are serious crimes.

Ruark rightly argues that special circumstances may lessen the importance of that interest.  See id.  Civil commitment may diminish the risks attached to releasing an accused criminal without punishment.  So too may the length of pretrial detention if an individual serves time equal to or greater than his likely sentence if found guilty.  See id.  But these caveats do not apply to Ruark's case.  There is no evidence as to his likelihood of civil commitment, and the crimes with which he was charged carry mandatory sentences well in excess of the his current pretrial detention.  Under the facts of this case, the district court did not err in finding important governmental interests at stake.

15

Second, the district court must conclude that involuntary medication will significantly further those concomitant state interests. Id. at 181, 123 S. Ct. at 2184. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. On the evidence presented at Ruark's Sell hearing, the government met this burden too. Both Dr. Sarrazin and Dr. Preston-Baecht testified that, in their experience and according to studies, 75 to 80 percent of patients who are involuntarily medicated are restored to competency. In Diaz, this Court relied on precisely this evidence to conclude the district court did not clearly err as to the second Sell factor. 630 F.3d at 1332. We hold the same here.

Within the second factor, the government must also show that the "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181, 123 S. Ct. at 2184-85. Here, too, the government satisfied that burden. Dr. Sarrazin testified as to the limited side effect of the particular, intended antipsychotic medication as well as to the procedures for closely monitoring those side effects.

Third, the district court must conclude that involuntary medication is necessary to further the government interests. Id. at 181, 123 S. Ct. at 2185. Specifically, the district court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. That is precisely

16

what the district court did here, supported by ample evidence.  Dr. Preston-Baecht noted that paranoid schizophrenia has a strong biological basis and that Ruark is unlikely to recover in the absence of medication.  She testified that the variety of non-medication alternatives, such as the competency restoration group, counseling, and psychotherapy, would all be ineffective because of Ruark's persistent paranoia.

Fourth, as we have said, the district court must also conclude that administration of the drugs is medically appropriate.  Id.  Here, the government has presented an individualized treatment plan that details the drugs to be used and the relevant dosage ranges. Both Dr. Sarrazin and Dr. Preston-Baecht testified that the administration of antipsychotics would be medically appropriate in this case.  Dr. Sarrazin, further, proposed a detailed treatment plan describing the procedure to be followed if a court orders Ruark to be involuntarily medicated.  Additionally, Dr. Sarrazin testified that any dosage going beyond the range described in the PDR reflects the learned experience of the medical community with regard to dosing.

The magistrate judge and district court were in the best position to make factual findings based on evidence presented at these two separate hearings.  As this Court held in Diaz, we review these factual findings under the second, third, and fourth prongs of the Sell analysis only for clear error.  Diaz, 630 F.3d at 1330-31.  The record precludes our finding clear error in the decision of the district court

17

not to upend the medical analysis offered in these hearings.  This decision is necessarily limited to the facts of this case and the evidence presented before the magistrate judge and district court.  Additionally, the only issue before this Court is Ruark's involuntary medication.  At this time, there is no claim seeking release from Springfield, release from BOP custody, or for dismissal of the indictment against Ruark.

As the Supreme Court noted in <u>Sell</u> (and this Court repeated in <u>Diaz</u>), the instances in which involuntary medication is appropriate "may be rare." 539 U.S. at 180, 123 S. Ct. at 2184.  But where, as here, the government presents clear and convincing evidence that each of the four <u>Sell</u> requirements have been met, the district court does not clearly err in granting the government's motion.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's order dated October 2, 2014.

**AFFIRMED.**